Goldman Sachs v. Schottenstein We'll wait just a moment for the room to settle before we begin. All right, Ms. Haviv, whenever you are ready, you may begin. Thank you, Your Honor.  My name is Jordana Haviv of Friedman Norman Friedland, and I represent appellants Evan and Avi Schottenstein. As I'll get into in a moment, appellants are seeking to vacate the arbitration award entered in this case because the arbitrators unreasonably refused to continue the final hearing and because the arbitral chairperson had an undisclosed conflict of interest, which taints the entire proceedings with an impression of possible bias. To frame the legal issues, some facts bear highlighting. Appellants managed their grandmother's $70 million accounts for approximately 10 years. During that time, their grandmother achieved net out-of-pocket gains of approximately $30 million. And in that same time frame, appellants earned just about $3 million from managing the accounts. Notwithstanding these favorable returns, their cousin, Alexis Schottenstein, persuaded their grandmother to bring in arbitration against her grandsons. Counsel, you can use your time however you wish, but we are all familiar with the facts. Understood. Thank you. I think I'll move on, but I think part of the important fact here is what exactly came of the proceeding that we argue was tainted by this impression of possible bias, and specifically that an award was entered in the amount of $9 million, which was over three times more than appellants ever earned. So the key issue then below for the arbitrators was whether the allegations of their grandmother were true or whether Alexis Schottenstein was merely taking advantage of her grandmother to enrich herself. And as I'll explain in a moment, appellants were prevented from obtaining and presenting Alexis Schottenstein's testimony because the arbitral panel unreasonably refused to postpone the final hearings and ordered it to be held over Zoom, even though FINRA's rules and the governing arbitration agreement don't permit that, and even though doing so prevented appellants from compelling Alexis to testify under this court's precedent in managed care, which, as the court knows, deprives arbitrators of the power to compel witnesses to attend a virtual hearing. And, again, the impression of possible bias here arises from the fact that during the pendency of the arbitration, the arbitral chairperson, and it's important here that it was the chairperson, commenced a lawsuit against State Farm, where Evan Schottenstein had accepted a job. And not only that, but both the lawsuit and Evan's job involved the same product, property. It's not disputed here that Chairperson Solomon had knowledge of the conflict, nor is it disputed that she commenced a lawsuit against State Farm during the pendency of the arbitration. And it's also undisputed that Chairperson Solomon heard testimony during the final hearings that Evan Schottenstein interviewed for and later accepted a job at State Farm. Chairperson Solomon was required- Can I ask you a question? Of course. It wasn't clear to me from the record. It looked like, although there were, I guess, two instances in the 145 hours of the arbitration hearing where it was mentioned that Evan had received and accepted an offer at State Farm, it wasn't clear to me whether he had started working at State Farm at that point in time. I'm not sure that even matters, but that's one area that it would be great to have some clarification on. If there is something in the record that indicates that he had started working there prior to the time of the conclusion of the hearings, could you just let me know where I could find that, please? Sure. I don't believe that there is something in the record that shows that he had started working there. But the testimony, as it sounds like Your Honor is well aware, is that he interviewed for in August 2019 a position and then accepted in September 2019 a position. Thank you. Thank you. And then it was Chairperson Solomon here who signed the order that unreasonably converted the final hearings to Zoom. And it was this order, of course, that prevented the appellants from presenting the keystone of their defense. The impression of possible bias here is magnified because the chairperson then led the panel to award over $9 million against appellants. That's just one more clarification. Was the chairperson's suit dismissed before the arbitration hearing was even scheduled? I believe it was pending at the time of the arbitration hearing, but I can double check that. Okay. I had thought it was dismissed in May of the year before, but I could be mistaken about that. I can double check and address it on rebuttal. This sizable award has ruined my clients' reputations, rendered them virtually unemployable as financial consultants, and bankrupted Evan Schottenstein. And it is precisely because arbitrators have, quote, completely free reign to decide the law as well as the facts and are not subject to appellate review that the Supreme Court requires courts to be scrupulous to safeguard their impartiality by enforcing the simple requirement that arbitrators disclose to the parties any dealings that might create an impression of possible bias. That's the Commonwealth case. Chairperson Salmon did not abide that simple requirement, and her failure to do so along with the resulting award demonstrate at least an impression of possible bias here. Indeed, under the University Commons case, the arbitrator must disclose any possible conflict as soon as it becomes apparent. Chairperson Salmon never did that. Appellants only discovered the conflict after the conclusion of the arbitration when they hired an investigator. And as this court has held in Middlesex- Let me ask you something just to understand the extent of what you're arguing. Let's say that the chair had sued State Farm five years before and had had the case dismissed. Would there still be, in your opinion, a conflict of interest? I think that's more tenuous. I think it's a reasonable, as your Honor knows, a reasonable distrust under the circumstances, but there are numerous cases, Commonwealth among them, that hold that the temporal proximity of the event is relevant here. And here, it was only several months in between the events, and I think that's particularly relevant here, including the fact that it was the chairperson. So I think those factors point towards support our position. I think five years is probably more tenuous, and I- How would you draw the line, and how do you make that determination? Well, that's always the question, your Honor. I think, again, I think here, in particular, it's the multitude of circumstances that it's the fact that the arbitrator, the chairperson, was personally involved in the lawsuit. There's a number of other cases that talk about even something more removed than personal involvement. She had a direct financial interest in the lawsuit. The lawsuit involved the same product that Mr. Schottenstein had accepted a job in, property. And I think it's fair that if you have a wrongful, a denial of a homeowner's claim, you might harbor potential biases against your insurer and their employees. I think all of those factors, in addition to the fact that there was temporal proximity here, in this case, point towards the fact that our argument should be accepted. I understand, you know, if it were five years, if it were no direct pecuniary interest, those factors tend towards the other side of the spectrum. But I understand the point of where to draw the line. I think this case falls over the line. I mean, aren't there other factors present here that are on the other side of the ledger? Policyholders sue their insurance companies all the time over sort of, you know, sometimes not something of issues. And State Farm wasn't a party here. I mean, like, surely those, you would have to acknowledge that those factors sort of weigh on the other side of the calculus. Of course. And I think part of the issue, as some of the cases say, is this is why we are entitled, we meaning my clients, are entitled to the disclosures. Because there was no opportunity to probe sort of the extent of the conflict or whether Chairperson Solomon did harbor any, you know, thoughts of ill will towards her insurance company following the, because there just, there was no disclosure. And I think important here is the language of Middlesex, which talks about how the Commonwealth Codings case has been interpreted as a somewhat analogous to a per se rule or an irrebuttable presumption requiring the award to be set aside once it is established that the arbitrator actually knew of, yet failed to disclose potentially prejudicial facts, which could impair his judgment. I don't see how the other side gets over that. It's an irrebuttable presumption or a per se rule that requires disclosure. And it's undisputed that Chairperson Solomon was aware of the lawsuit, was aware of the testimony from Ms. Patip, that Evan had accepted a job there. And it's undisputed that it should have been disclosed on her arbitrary, well, I'm not sure that's undisputed, but we would argue it should have been disclosed because it certainly creates a reasonable impression of possible bias. Middlesex, though, tell me if I'm wrong about this, in Middlesex, the dispute was with a party. Pardon me? With a party to the arbitration. I believe that Middlesex involved what I think was the family owned insurance company of the arbitrator with the defendant. Yes. So yes. And one of the issues I just wanted to address briefly before the panel is our argument that these are questions that warrant a no vote review here, as I'm not sure the party's fully  And I think appellee agrees that the questions for the court or whether the district court properly concluded that appellants failed to establish that the panel had no reasonable basis for the postponement. And then second, the chairperson's evident partiality. And the disputed issues here relate both to a reasonable person standard. And that is a legal determination for the court, which requires to no vote review. I see my time is almost up. So absent further questions, I'll reserve the remaining time for rebuttal. Thank you, Ms. Haviv. You've reserved four minutes for rebuttal. Thank you, Your Honor. And we'll hear from Ms. Corey. May it please the court. I'm Alyssa Corey from Schutzen Bowen on behalf of appellees. The district court correctly confirmed the arbitration award after determining no arbiter misconduct resulted from the denial of advisors motion to postpone the final arbitration hearing or from the nondisclosure of an arbitrator's lawsuit against a potential employer of an advisor. That decision should be affirmed. FAA Section 10A3 permits vacature where the arbitrators were guilty of misconduct in refusing to postpone the hearing. Upon sufficient ground shown, advisors failed to carry that burden and the district court correctly identified a reasonable ground for refusing to postpone the hearing. On appeal, advisors suggested the district court's identified reasonable basis for the panel's refusal to postpone is unreasonable. Um, when considered against advisors to reasons in favor of postponement, but this reasoning attempts to redefine the district court's task in evaluating alleged misconduct under Section 10A3 to require express acknowledgment of advisors reasons for the request. I'm sorry to interrupt, but since we spent a lot of time, um, with your friend on the other side of the aisle, they're talking about, uh, the alleged conflict of interest. I wanted to ask you some questions about that. Why didn't, uh, I mean, is, is it a problem that the chief arbitrator didn't disclose that she had had a lawsuit against State Farm? Surely, when you're looking at disclosure, was it a requirement that the lawsuit be disclosed? Yes, but when we're looking at a limited ground and basis for vacature, um, under evident impartiality, an arbitration award may be vacated only when either one in actual conflict exists or the arbitrator knows of, but fails to disclose information that would lead a reasonable person to believe that a potential conflict exists. And I guess, I guess she wouldn't have known that there was even allegedly a potential conflict until such time as the email came out during the course of the hearing, which her lawsuit had been dismissed. Is that right? Correct, Judge Rosenbaum. But she should have disclosed it at that point, is what you're, you're conceding that? Yes. Okay. Yes. And the advisor's claim, you know, it's kind of unclear that this lawsuit that was creating bias was pending, um, during the arbitration hearing in October 2020, but at DE75 at 26, um, the lawsuit concluded in May 2020 after three months, and the hearing did not begin until October 2020, um, when that, um, evidence came to light through the text messages. And if we're looking at, um, DE76-A at page three, um, the testimony there was, um, I'm having an interview at State Farm Insurance in Englewood, New Jersey, um, and that other evidence that came through, through the text messages between Advisor Evan and Kathy Patap, where he shared that he accepted this job with State Farm in New Jersey, was that he needed to get his property casualty insurance license before he could start working, and that's, um, DE76-31 at 13 to 14 and 22 to 23. Um, but at best, the evidence of this lawsuit supports the mere appearance of partiality or bias that is insufficient to set aside an award. Um, as Judge Newsom pointed out, most of these cases that are vacating under the evident partiality ground require a direct relationship between a party to the lawsuit. You know, State Farm of Florida, you know, even assuming State Farm of Florida extends to State Farm of New Jersey, um, is not a party to the arbitration, you know, it is a potential employer of a party to arbitration, and that's the exact remote, uncertain, and speculative nature that is insufficient to establish a potential conflict that would warrant bigotry. Um, this fact-intensive inquiry, um, that was done by the trial court, um, does not lend, um, to reversal on that basis, as these cases cited by the advisors are distinguishable. Um, direct relationships with a party, um, business with a party, or engaging in ongoing litigation with a party. Um, um, so, obviously, happy to discuss the first issue, um, if there are any questions that we can resolve for the court, um, on that ground, um, but if not, we will stand on our briefing on those issues, and we, obviously, will note that under the FAA, courts may vacate an arbitrator's decision only in very unusual circumstances, and we'd ask this court to affirm. Thank you. Thank you, counsel. Ms. Haviv. Um, so, I wanted to start, I think my colleague, um, did concede that the, the conflict should have been disclosed at some point, um, which is exactly what we're talking about here. We're not talking about if there was actual bias. There doesn't need to be actual bias. That's what commonwealth says. That's what the cases following it say. There's just, all we need is an impression, a reasonable impression of partiality, um, and we have that here. I understand the point that some of these cases involve direct relationships, but not all of them do. Um, all that's required is a non-trivial business relation. What's your best case? What's our best case? I mean, I think it's Middlesex, actually. I understand, um, that, that was a more direct relationship on one side, but the, our, the chairperson herself was the individual involved here, and again, in that case, the fact that there was an award, um, at the end of the case of $1.2 million was a factor that the, the panel spoke about in consideration. I think here, again, um, we have a chairperson who led a panel to a $9 million award against appellants, which was three times as much money as they ever made. Um, um, and excuse me, I, I misspoke about the record. I, you know, we can see that the, my colleague is right about the timing of the, um, of the lawsuit. Um, but again. Just, um, just out of curiosity, with respect to the second email, which talks about how, uh, your client accepted the offer and intended to start after he obtained his, I guess his license, how long does it take to obtain a license? Um, I'm, I'm not sure how long it takes to obtain a property casualty license. I think it's one of, um, those licenses where you study probably for several months and then take it. That would be, I guess, but I, I, I, that's outside my expertise. So, is there any indication in the record that he obtained that license? Not in the record, no. Okay. Thank you. Um, pardon me. Sorry. I thought, oh, okay. Um, and I, and I just wanted to address briefly, I know I'm limited on time here, the, um, the unreasonable refusal to postpone, um, and, and the errors there. I think one that we've spoken about in the briefing, um, is the reference to an indefinite request for a postpone, a request for an indefinite postponement. Um, that's not what my clients ever requested. They requested a brief postponement to spring of 2021 and in consideration of the ongoing pandemic conceded that at that time, if in-person hearings could no longer go forward, they would proceed virtually at that time. Um, but that time is a timeframe that they could have, um, had their motion to enforce the subpoenas to Wells Fargo and Alexa Schottenstein. So let me ask you something about that. Um, with respect to the subpoenas that you're talking about, didn't the request for a postponement refer only generally to evidence from quote non-FNRA member third parties, unquote, without specifically naming Alexis or Wells Fargo? That's correct. But it did specifically reference managed care at the time and the fact that, um, it would have been difficult for them to obtain, uh, in person, uh, testimony virtually from folks under the courts, uh, holding in that case. And so what specifically would you point to in that motion, uh, that put the, the arbitration panel on notice that this was regarding, uh, this was going to be material testimony about a material issue? Um, the, the same paragraph we're talking about with respect to managed care, that's, um, you know, uh, uh, that's what I would point your honor to. Okay. Thank you. Um, I see I'm at nine seconds. If there are no further questions, um, thank you. We'd ask that the panel vacate the arbitration award. Thank you very much, counsel.